Dissenting opinion filed by Circuit Judge REYNA.
PLAGER, Circuit Judge.
This is a patent case, in which the outcome turns on the application of the ‘abstract idea’ test, a judicially-created limitation on patent eligibility under § 101 of the Patent Act, 35 U.S.C. § 101.
Plaintiff-Appellant Amdocs (Israel) Limited (“Amdocs”) sued Defendants-Ap-pellees Openet Telecom, Inc. and Openet Telecom Ltd. (collectively, “Openet”) for infringing four U.S. Patents, Nos. 7,631,-065 (“’065 patent”); 7,412,510 (“’510 patent”); 6,947,984 (“’984 patent”); and 6,836,-797 (“’797 patent”). In the wake of Alice Corp. v. CLS Bank International, — U.S. -, 134 S.Ct. 2347, 189 L.Ed.2d 296 (2014), the district court granted Openet’s motion for judgment on the pleadings, finding that the patents were not directed to patent eligible subject .matter under § 101. Amdocs appeals.
For the reasons we shall explain, we reverse and remand for further proceedings.
*1291 BACKGROUND
Prosecution History and Technology
Although we need not recapitulate every detail of these patents, we describe them sufficiently for purposes of this opinion. Additional background is available in our opinion from the prior appeal in this case. See Amdocs (Israel) Ltd. v. Openet Telecom, Inc., 761 F.3d 1329, 1331-36 (Fed. Cir. 2014) (‘Amdocs I”).
The patents in suit concern, inter alia, parts of a system designed to solve an accounting and billing problem faced by network service providers. Each patent descends from U.S. Patent Application No. 09/442,876, which issued as U.S. Patent No. 6,418,467. One of the patents in suit, the ’797 patent, issued as a result of a continuation-in-part application, while the other three patents issued as a result of continuation applications.
The ’065 patent concerns a system, method, and computer program for merging data in a network-based filtering and aggregating platform as well as a related apparatus for enhancing networking accounting data records. The ’510 patent concerns a system, method, and computer program for reporting on the collection of network usage information. The ’984 patent concerns a system and accompanying method and computer program for reporting on the collection of network usage information from a plurality of network devices. The ’797 patent concerns a system, method, and computer program for generating a single record reflecting multiple services for accounting purposes.
Each patent’s written description describes the same system, which allows network service providers to account for and bill for internet protocol (“IP”) network communications. The system includes network devices; information source modules (“ISMs”); gatherers; a central event manager (“CEM”); a central database; a user interface server; and terminals or clients. See, e.g., ’065 patent at 4:29-33, 43-54.
Network devices represent any devices that could be included on a network, including application servers, and also represent the source of information accessed by the ISMs. Id. at 5:10-26. The ISMs act as an interface between the gatherers and the network devices and enable the gatherers to collect data from the network devices. Id. at 5:33-35. The ISMs represent modular interfaces that send IP usage data in real time from network devices to gatherers. Id. at 5:35-39. Gatherers can be hardware and software installed on the same network segment as a network device or on an application server itself to minimize the data traffic impact on a network; gatherers “gather the information from the ISMs.” Id. at 6:54, 58-64. Gatherers also normalize data from the various types of ISMs and serve as a distributed filtering and aggregation system. Id. at 7:5-8. The CEM provides management and control of the ISMs and gatherers, and the CEM can perform several functions including performing data merges to remove redundant data .Id. at 8:13-67. The central database is the optional central repository of the information collected by the system and is one example of a sink for the data generated by the, system. Id. at 9:1-5. The user interface server allows multiple clients or terminals to access the system, and its primary purpose is to provide remote and local platform independent control for the system. Id. at 10:5-12.
Importantly, these components are arrayed in a distributed architecture that minimizes the impact on network and system resources. Id. at 3:56-65. Through this distributed architecture, the system minimizes network impact by collecting and processing data close to its source. Id. The system includes distributed data gathering, filtering, and enhancements that en *1292 able load distribution. Id. at 4:33-42. This allows data to reside close to the information sources, thereby reducing congestion in network bottlenecks, while still allowing data to be accessible from a central location. Id. at 4:36-39. Each patent explains that this is an advantage over prior art systems that stored information in one location, which made it difficult to keep up with massive record flows from the network devices and which required huge databases. See, e.g., id. at 4:39-42.
Procedural History
In 2010, Amdocs sued Openet for patent infringement in the United States District Court for the Eastern District of Virginia. Amdocs asserted that Openet infringed claims 1, 4, 7, 13, and 17 of the ’066 patent; claims 16, 17, and 19 of the ’610 patent; claims 1, 2, 7, 8, and 13 of the ’984 patent; and claims 1, 2, 7, 8, and 19 of the ’797 patent.
In its answer and counterclaim, Openet alleged invalidity, unenforceability, and non-infringement. The parties filed motions addressing claim construction and summary judgment. The district court granted Openet’s motion for summary judgment of non-infringement and Am-docs’s motion for summary judgment of no inequitable conduct. Upon motions of the parties, which the court granted, certain claim constructions were made. However, the court denied the parties’ motions for summary judgment with respect to validity. The court later issued an opinion explaining its bases for its non-infringement and inequitable conduct summary judgment rulings, while also providing its claim constructions. Amdocs appealed the trial court’s judgment to this court.
On appeal, we affirmed two claim constructions and vacated and modified another construction. We approved of the district court’s construction of “enhance” to mean “to apply a number of field enhancements in a distributed fashion.” Amdocs I, 761 F.3d at 1338-40. In so doing, we approved of the district court’s “reading the ⅛ a distributed fashion’ and the ‘close to the source’ of network information requirements into the term ‘enhance.’ ” Id. at 1340. We also approved of the construction of “completing” to mean “enhance a record until all required fields have been populated.” Id.
However, we vacated the district court’s construction of “single record represents each of the plurality of services” as “one record that includes customer usage data for each of the plurality of services used by the customer on the network” but not including records that aggregated usage data. Id. We substituted a plain meaning interpretation that allowed for the inclusion of a plurality of services by aggregation. Id. at 1340-41. As a result, we reversed the grant of summary judgment with respect to the '066 patent, the '510 patent, and the ’984 patent and vacated the grant of summary judgment with respect to the ’797 patent. Id. at 1341-43.
During the time the case was before us on appeal from the district court, the Supreme Court issued its opinion in Alice. Following the remand from this court in Amdocs I, Openet moved for judgment on the pleadings by arguing that, pursuant to Alice, all asserted claims were ineligible under § 101. In response, Amdocs argued that Openet’s motion was procedurally barred and contrary to the law of the case.
The district court permitted the motion because it had not resolved whether the patents were directed to ineligible subject matter under § 101 and because, even if the issue had been addressed, the court stated that Alice “represented a change, or a significant clarification, of the law.” Amdocs (Israel) Ltd. v. Openet Telecom, Inc., 56 F.Supp.3d 813, 819 (E.D. Va. 2014).
*1293 In due course, the district court granted Openet’s motion and invalidated the asserted claims of all four patents as ineligible under § 101. Amdocs appeals. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).
Discussion
We review a grant of judgment on the pleadings under the procedural law of the regional circuit. Allergan, Inc. v. Athena Cosmetics, Inc., 640 F.3d 1377, 1380 (Fed. Cir. 2011). The Fourth Circuit reviews a grant of judgment on the pleadings without deference, applying the same standard as a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). Burbach Broad. Co. of Del. v. Elkins Radio Corp., 278 F.3d 401, 405-06 (4th Cir. 2002). Therefore, we assume the facts alleged in the complaint are true and draw all reasonable factual inferences in favor of the non-movant. Id. We review the district court’s determination of patent eligibility under § 101 without deference, as a question of law. DDR Holdings, LLC v. Hotels.com, L.P., 773 F.3d 1245, 1255 (Fed. Cir. 2014).
1.
The Doctrine: The statutory rule governing patent eligibility—that is, the criteria for identifying inventions that are eligible to be patented—is found in § 101 of the Patent Act. As recodified by Congress in 1952, § 101 provides that “[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.”
It is obvious that the subject matter described in § 101 is expansive. As the Supreme Court has observed, the “subject-matter provisions of the patent law have been cast in broad terms to fulfill the constitutional and statutory goal of promoting ‘the Progress of Science and the useful Arts.’” Diamond v. Chakrabarty, 447 U.S. 303, 315, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980) (quoting U.S. Const, art. I, § 8, cl. 8).
Despite this broad mandate, judicial gloss on the law of patent eligibility has long recognized that certain fundamental principles are not included in that broad statutory grant. Though over the -years these principles have been described in differing terms, in today’s vernacular these exceptions are called “[l]aws of nature, natural phenomena, and abstract ideas.” Alice, 134 S.Ct. at 2354 (quotation marks and citation omitted); see also Le Roy v. Tatham, 55 U.S. 156, 183, 14 How. 156, 14 L.Ed. 367 (1853) (Nelson,. J., dissenting) (tracing the “proper subject-matter of a patent” to at least the British case of Boulton v. Bull, 2 H. Bl. 463, 126 Eng. Rep. 651 (C.P. 1795)).
The two-step framework, set out by the Supreme Court for distinguishing patents that claim so-called laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts, is now familiar law. See Alice, 134 S.Ct. at 2355 (following Mayo Collaborative Servs. v. Prometheus Labs., Inc., —.U.S. -, 132 S.Ct. 1289, 182 L.Ed.2d 321 (2012)). This framework is sometimes collectively referred to as Alice/Mayo.
First, we determine whether “the claims at issue are directed to one of those patent-ineligible concepts.” Id. If so, we next consider elements of each claim both individually and “as an ordered combination” to determine whether the additional elements “‘transform the nature of the claim’ into a patent-eligible application.” Id. (quoting Mayo, 132 S.Ct. at 1298, 1297).
The Court describes step two of this analysis as a search for an “inventive concept”—i.e., an element or ordered combi *1294 nation of elements that is “sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.” Id. (quoting Mayo, 132 S.Ct. at 1294).
2.
= The Cases: Our cases generally follow the step one/step two Supreme Court format, reserving step two for the more comprehensive analysis in search of the ‘inventive concept.’ Recent cases, however, suggest that there is considerable overlap between step one and step two, and in some situations this analysis could be accomplished without -going beyond step one. See Enfish, LLC, v. Microsoft Corp., 822 F.3d 1327, 1334-36 (Fed. Cir. 2016); see also Elec. Power Grp., LLC v. Alstom S.A., 830 F.3d 1350, 1353 (Fed. Cir. 2016) (“the two stages involve overlapping scrutiny of the content of the claims ... [and] there can be close questions about when the inquiry should proceed from the first stage to the second”); BASCOM Glob. Internet Servs., Inc. v. AT & T Mobility LLC, 827 F.3d 1341, 1349 (Fed. Cir. 2016) (“[T]he claims and their specific limitations do not readily lend themselves to a step-one binding that they are directed to a nonabstract idea. We therefore defer our consideration of the specific claim limitations’ narrowing effect for step two.”).
Whether the more detailed analysis is undertaken at step one or at step two, the analysis presumably would be based on a generally-accepted and understood definition of, or test for, what an ‘abstract idea’ encompasses. However, a search for a single test or definition in the decided cases concerning § 101 from this court, and indeed from the Supreme Court, reveals that at present there is no such single, succinct, usable definition or test. The problem with articulating’a single, universal definition of ‘abstract idea’ is that it is difficult to fashion a workable definition to be applied to as-yet-unknown cases with as-yet-unknown inventions. That is not for want of trying; to the extent the efforts so far have been unsuccessful it is because they often end up using alternative but equally abstract terms or are overly narrow.[1]
Instead of a definition, then, the decisional mechanism courts now apply is to examine earlier cases in which.a similar or parallel descriptive nature can be seen—what prior cases were about, and which way they were decided. See, e.g., Elec. Power Grp., 830 F.3d at 1353-54.[2] That is the classic .common law methodology for creating law when a single governing definitional context is not available. See generally Karl N. Llewellyn, The Common Law Tradition: Deciding Appeals (1960). This more flexible approach is also the approach employed by the Supreme Court. See Alice, 134 S.Ct. at 2355-57. We shall follow that approach here.
. The dissent, in its discussion of the majority opinion’s approach, states that the *1295 analysis in which the majority engages involves a ■ comparison “of the asserted claims in this case to the claims at issue in some, but not all, of the cases where we have addressed patent eligibility.” Dissent at 1307. As earlier noted, applying prior precedents of the court to the current case is indeed the common law approach for deciding cases, including patent cases—i.e., applying the law to comparable facts. See, e.g., Alice, 134 S.Ct. at 2355-60 (relying on precedent with respect to step one and step two); Elec. Power Grp., 830 F.3d at 1353-56 (same). Furthermore, discussing in an opinion only the most relevant prior opinions, rather than every prior opinion in an actively-litigated field, is a necessary discipline if opinions are to be read; rather than just written. , _
The dissent offers a different paradigm for identifying an abstract idea: “it is apparent that a desired goal (i.e., a ‘result or effect’), absent structural or procedural means for achieving that goal, is an abstract idea.” Dissent at 1309. The dissent focuses on the difference between ‘means’ and ‘ends.’ Id. at 1309. We note that, though not in terms of ‘abstract idea’ but rather adequacy of definition, years, ago the Supreme Court outlawed such broad ‘ends’ or function claiming as inconsistent with the purposes of the Patent Statute.[3] Congress, however, a few years later softened the rule. Patentees could write claim language to broadly describe the purpose or function of their invention, and when they did the claim would not cover the bare function or goal, however performed, but only as limited to the particular means (and equivalents) for implementing that function or goal as described by the paten-tee in the patent’s “specification.”
This, of course, is the “means-plus-function” practice codified in 35 U.S.C. § 112 ¶ 6 (now § 112(f)). The dissent’s paradigm would seem similar, but differs in significant respects. Though § 112 ¶ 6 permits .the ‘means’ to be found in the patentee’s “specification,” meaning the written description and the claims of the patent, the dissent would save the patent’s eligibility under § 101 only if the claim at issue itself explicitly states the necessary ‘means.’ In the dissent’s step two, we must find “a particular means for accomplishing an underlying goal” through careful “limitation-by-limitation analysis” of the claim. Id. at 1311. We commend the dissent for seeking a creative way of incorporating aspects of well-known doctrine in the search for what is an ‘abstract idea,’ but that is not now the law, either in statute or in court decision.[4] At best, as this court has previously stated, the dissent’s analysis may be “one helpful way of double-checking the application of the Supreme Court’s framework to particular claims—specifically, when determining whether the claims meet the requirement of an inventive concept in application.” Elec. Power Grp., 830 F.3d at 1356.
3.
We begin, then, with an examination of eligible and ineligible claims of a similar nature from past cases. For example, in *1296 Digitech, one of the representative claims described a process of organizing information through mathematical correlations with merely generic gathering and processing activities. See Digitech Image Techs., LLC v. Elecs. for Imaging, Inc., 758 F.3d 1344, 1350 (Fed. Cir. 2014). The claim at issue:
A method of generating a device profile that describes properties of a device in a digital image reproduction system for capturing, transforming or rendering an image, said method comprising:
generating first data for describing a device dependent transformation of color information content of the image to a device independent color space through use of measured chromatic stimuli and device response characteristic functions; generating second data for describing a device dependent transformation of spatial information content of the image in said device independent color space through use of spatial stimuli and device response characteristic functions; and combining said first and second data into the device profile. .
Id. at 1351 (quoting patent at issue).
While the court did not parse the analysis into discrete step one and step two stages, it found that this claim recited an “ineligible abstract process of gathering and combining data that does not require input from a physical device” and that “the two data sets and the resulting device profile are ineligible subject matter.” Id. The court observed that “[without additional limitations, a process that employs mathematical algorithms to manipulate existing information to generate additional information is not patent eligible.” Id. The court determined that the claim was ineligible.
Similarly, in Content Extraction, the court examined a representative claim reciting:
A method of processing information from a diversity of types of hard copy documents, said method comprising the steps of:
(a) receiving output representing a diversity of types of hard copy documents from an automated digitizing unit and storing information from said diversity of types of hard copy documents into a memory, said information not fixed from one document to the next, said receiving step not preceded by scanning, via said automated digitizing unit, of a separate document containing format requirements;
(b) recognizing portions of said hard copy documents corresponding to a first data field; and
(c) storing information from said portions of said hard copy documents corresponding to said first data field into memory locations for said first data field.
Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat’l Ass’n, 776 F.3d 1343, 1345 (Fed. Cir. 2014).
Under step one, the court characterized all of the claims at issue (which were similar to the representative claim) as being directed to the abstract idea of “1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory.” Id. at 1347. The court commented that data collection, recognition, and storage were “undisputedly well-known.” Id. Under step two, the court found no limitations[5] that, considered alone and in an ordered combination, transformed the claim into a patent-eligi *1297 ble application of an abstract idea. Id. at 1347-48. The court observed that the role of a computer in a computer-implemented invention would only be meaningful in a § 101 analysis if it involved more than the performance of “well-understood, routine, [and] conventional activities previously known to the industry.” Id. (quoting Alice, 134 S.Ct. at 2359). The court noted that all of the limitations at issue involved well-known, routine, and conventional functions of computers and scanners. Id. at 1348-49. The claims were ineligible.
More recently, in In re TLI, the court examined a representative claim that recited:
A method for recording and administering digital images, comprising the steps of:
recording images using a digital pick up unit in a telephone unit,
storing the images recorded by the digital pick up unit in a digital form as digital images,
trahsmitting data including at least the digital images and classification information to a server, wherein said classification information is- prescribable by a user of the telephone unit for allocation to the digital images,
receiving the data by the server,
extracting classification information which characterizes the digital images from the received data, and
storing the digital images in the server, said step of storing taking into consideration the classification information.
In re TLI Commc’ns LLC Patent Litig., 823 F.3d 607, 610 (Fed. Cir. 2016).
Under step one, the court found that the claims were directed to the abstract idea of “classifying and storing digital images in an organized manner.” Id. at 613. Also under step one, the court found that the claims were not directed to a specific improvement in computer functionality, but instead were directed to the “use of conventional or generic technology in a nascent, but well-known environment, without any claim that the invention reflected] an inventive solution to any problem presented by combining the two.” Id. at 612. Under step two, the court found that the claims did not recite any limitations that when considered individually and as an ordered combination transformed the abstract idea into a patent-eligible application of that idea. Instead, the recited components and functions were well-understood, routine, conventional activities previously known in the industry. See id. at 613-14. The components were described in “vague, functional” terms that were insufficient to confer eligibility and failed to provide the requisite details to implement the claimed abstract idea. Id. at 615.
The ineligible claims in the preceding cases[6] may be contrasted with eligible claims in other cases. For example, in DDR Holdings, the court found that the asserted claims did not recite a step or function performed by a computerized mathematical algorithm but were instead focused on a challenge particular to the Internet. DDR Holdings, 773 F.3d at 1257. The representative claim recited:
A system useful in an outsource provider serving web pages offering commercial opportunities, the system comprising:
*1298 (a) a computer store containing data, for each of a plurality of first web pages, defining a plurality of visually perceptible elements, which visually perceptible elements correspond to the plurality of first web pages;
(i) wherein each of the first web pages belongs to one of a plurality of web page owners;
(ii) wherein each of the first web pages displays at least one active link associated with a commerce object associated with a buying opportunity of a selected one of a plurality of merchants; and
(iii) wherein the selected merchant, the out-source provider, and the owner of the first web page displaying the associated link are each third parties with respect to one other;
(b) a computer server at the outsource provider, which computer server is coupled to the computer store and programmed to:
(i) receive from the web browser of a computer user a signal indicating activation of one of the links displayed by one of the first web pages;
(ii) automatically identify as the source page the one of the first web pages on which the link has been activated;
(iii) in response to identification of the source page, automatically retrieve the stored data corresponding to the source page; and
(iv) using the data retrieved, automatically generate and transmit to the web browser a second web page that displays: (A) information associated with the commerce object associated with the link that has been activated, and (B) the plurality of visually perceptible elements visually corresponding to the source page.
Id. at 1249-50.
The court observed that the “claimed solution [was] necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks.” Id. at 1257. Analyzing the claims under step two, the court noted when the claim limitations were taken together as an ordered combination, they recited an invention that was not merely “the routine or conventional use of the Internet.” Id. at 1259.
More recently, in BASCOM, the court examined several claims including the following claim:
1. A content filtering system for filtering content retrieved from an Internet computer network by individual controlled access network accounts, said filtering system comprising:
a local client computer generating network access requests for said individual controlled access network accounts;
at least one filtering scheme;
a plurality of sets of logical filtering elements; and
a remote ISP server coupled to said client computer and said Internet computer network, said ISP server associating each said network account to at least one filtering scheme and at least one set of filtering elements, said ISP server further receiving said network access requests from said client computer and executing said associated filtering scheme utilizing said associated set of logical filtering elements.
BASCOM, 827 F.3d at 1345.
In BASCOM, the court found that the claims were directed to an abstract idea under step one. Id. at 1347-49. Under step two, the court construed the claims in favor of the non-movant and found that the limitations of the claims, taken individually, recited generic computer, network, and Internet components which were not inventive by themselves. Id. at 1349-52. However, the court found that the ordered combination of these limitations provided *1299 the requisite inventive concept. Id, The claimed and described inventive concept was the “installation of a filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user.” Id, at 1350. This design permitted the filtering tool to have “both the benefits of a filter on ■ a local computer and the benefits’ of a filter on the [Internet Service Provider] server.” Id, This was not conventional or generic, and the claims did not preempt all ways of filtering content on the Internet—instead, the patent claimed and explained how a particular arrangement of elements was “a technical improvement over prior art ways of filtering such content.” Id. The court thus distinguished ineligible “abstract-idea-based solutions[s] implemented with generic technical components in a conventional way” from the eligible “technology-based solution” and “‘software-based invention[ ] that improve[s] the performance of the computer system itself.’ ” Id. at 1351 (citation omitted). The court therefore vacated the district court’s dismissal under Fed. R. Civ. P. 12(b)(6).[7]
4.
With this background in mind, we turn to an examination of the claims in the patents at issue to determine whether the trial court was correct in ruling them all to be invalid under § 101. In addition to taking into consideration the approved claim constructions, we examine the claims in light of the written description. See, e.g., Enfish, 822 F.3d at 1335 (applying step one involves considering the claims “in light of the specification”); In re TLI Commc’ns, 823 F.3d at 611-15 (examining the claims in light of the written description under steps one and two).
a. ’065 Patent
Amdocs asserted claims 1, 4, 7, 13, and 17 of the ’065 patent. Claim 1 is representative:
1. A computer program product embodied on a computer readable storage medium for processing network accounting information comprising:
computer code for receiving from a first source a first network accounting record; :
computer code for correlating the first network accounting record with accounting information available from a second source; and
computer code for using the accounting information with which the first network accounting record is correlated to enhance the.first network accounting record.
’065 patent at 16:4-14.
Under step one, the district court determined that this claim was directed to the abstract idea of “correlating two network accounting records to enhance the first record.” Amdocs, 56 F.Supp.3d at 820. Under step two, the district court found that claim 1 did not add a sufficient ‘inventive concept’ to confer eligibility.
We recognize, as the district court recognized, that “[a]t some level, ‘all inventions ... embody, use, reflect, rest upon, or apply laws of nature, natural phenomena,, or abstract ideas.’ ” Alice, 134 S.Ct. at 2354 (quoting Mayo, 132 S.Ct. at 1293) (emphasis added). What relative level of abstraction should we employ? From a macroscopic perspective, claim 1 could be described as focusing-on correlating two network accounting records to enhance the first record. Claim 1 could also be described in several other ways—such as focusing on a computer program that in- *1300 eludes computer code for receiving initial information, for correlating that initial information with additional information, and for using that additional information to enhance the initial information.
We have previously explained that somewhat (at least facially) similar claims involving the mere collection and manipulation of information do not satisfy § 101— under either step one or step two. See, e.g., Digitech, 758 F.3d at 1350 (abstract idea of “organizing information through mathematical correlations”); Content Extraction, 776 F.3d at 1347 (abstract idea of “1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory”); In re TLI Commc’ns, 823 F.3d at 613 (abstract idea of “classifying and storing digital images in an organized manner”).
In contrast, we have found eligibility when somewhat facially-similar claims are directed to an improvement in computer functionality under step one, see Enfish, 822 F.3d at 1335, or recite a sufficient inventive concept under step two—particularly when the claims solve a technology-based problem, even with conventional, generic components, combined in an unconventional manner. See DDR Holdings, 773 F.3d at 1256-59; see also BASCOM, 827 F.3d at 1349-52.
In this case, the claims are much closer to those in BASCOM and DDR Holdings than those in Digitech, Content Extraction, and In re TLI Commc’ns. Indeed, even if we were to agree that claim 1 is directed to an ineligible abstract idea under step one, the claim is eligible under step two because it contains a sufficient ‘inventive concept.’ Claim 1 requires “computer code for using the accounting information with which the first network accounting record is correlated to enhance the first network accounting record.” ’065 patent at 16:12-14. In Amdocs I, we construed “enhance” as being dependent upon the invention’s distributed architecture. 761 F.3d at 1338-40 (quoting ’065 patent at 7:51-57, 10:45-50, 7:7-8). We construed “enhance” as meaning “to apply a number of field enhancements in a distributed fashion.” Id. at 1340. We took care to note how the district court explained that “[i]n this context, ‘distributed’ means that the network usage records are processed close to their sources before being transmitted to a centralized manager.” Id. at 1338. And we specifically approved of the district court’s “reading the ‘in a distributed fashion’ and the ‘close to the source’ of network information requirements into the term ‘enhance.’ ” Id. at 1340.
As explained by the patent, this distributed enhancement was a critical advancement over the prior art:
Importantly, the distributed data gathering, filtering and enhancements performed in the system 100 enables load distribution. Granular data can reside in the peripheries of the system 100, close to the information sources. This helps avoids [ (sic) ] reduce congestion in network bottlenecks but still allows the data to be accessible from a central location. In previous systems, all the network information flows to one location, making it very difficult to keep up with the massive record flows from the network devices and requiring huge databases.
’065 patent at 4:33-42.
In other words, this claim entails an unconventional technological solution (enhancing data in a distributed fashion) to a technological problem (massive record flows which previously required massive databases). The solution requires arguably generic components, including network devices and “gatherers” which “gather” information. However, the claim’s enhancing limitation necessarily requires that these generic components operate in an uncon *1301 ventional manner to achieve an improvement in computer functionality.
The enhancing limitation depends not only upon the invention’s distributed architecture, but also depends upon the network devices and gatherers—even though these may be generic—working together in a distributed manner. The- patent explains that field enhancements are defined by network service providers for each field in which the network service provider wants to collect data. ’065 patent at 12:43-47. “A field enhancement specifies how the data obtained from the trigger of the enhancement procedure is processed before it is placed in a single field in the central database 175.” Id. at 11:2-5.
Typically, data collected from a single source does not contain all the information needed for billing and accounting, such as user name and organization. In such cases, the data is enhanced. By combining IP session data from multiple sources, such as authentication servers, DHCP and Domain Name servers, the gatherers create meaningful session records tailored to the [network service provider’s] specific requirements.
Id. at 7:51-57.
The gatherers provide enhancement. Id. at 10:45-48 (“As mentioned above, the gatherers 220 provide data enhancement features to complete information received from the ISMs 210.”). The gatherers also operate in a distributed fashion, id. at 4:33-42, and the gatherers depend upon the ISMs which receive information from network devices, id. at 5:10-26. Claim 1 includes the enhancing limitation which is individually sufficient for eligibility. But this enhancing limitation necessarily involves the arguably' generic gatherers, network devices, and other components working in an unconventional distributed fashion to solve a particular technological problem.
Claim 1 is therefore distinct from the ineligible claims in Digitech, Content Extraction, and In re TLI Commc’ns. The claim in Digitech was not tied to any particularized structure, broadly preempted related technologies, and merely involved combining data in an ordinary manner without any inventive concept. See 758 F.3d at 1350-51. In contrast, claim 1 of the ’065 patent is tied to a specific' structure of various components (network devices, gatherers, ISMs, a central event manager, a central database, a user interface server, and terminals or clients). It is narrowly drawn to not preempt any and all generic enhancement of data in a similar system, and does not merely combine the components in a generic manner, but instead purposefully arranges the components in a distributed architecture to achieve a technological solution to a technological problem specific to computer networks. See ’065 patent at 4:29-33, 4:43-54, 3:56-65, 4:33-42, 7:51-57, 10:45-50, 7:7-8, 7:62-67,11:1-7.
Similarly, claim 1 is distinct from the representative claim in Content Extraction, which ■ involved the generic, well-known steps of collecting data, recognizing data, and storing data. See 776 F.3d at 1347. Unlike the claim in Content Extraction, claim 1 of the ’065 patent depends upon a specific enhancing limitation that necessarily incorporates the invention’s distributed architecture—an architecture providing a technological solution to a technological problem. This provides the requisite ‘something more’ than the performance of “well-understood, routine, [and] conventional activities previously known to the industry.” See id. at 1347-48 (quoting Alice, 134 S.Ct. at 2359).
Claim 1 is similar to the claims in DDR Holdings and BASCOM. As in DDR Holdings, when the claim limitations were considered individually and as an ordered *1302 combination, they recited an invention that is not merely the “routine or conventional use” of technology. 773 F.3d at 1259. Here, claim 1 solves a technological problem (massive data flows requiring huge databases) akin to the problem in DDR Holdings (conventional Internet hyperlink protocol preventing websites from retaining visitors). Cf. Intellectual Ventures I LLC v. Capital One Bank (USA), 792 F.3d 1363, 1371 (Fed. Cir. 2015). Claim 1 involves some arguably conventional components (e.g., gatherers), but the claim also involves limitations that when considered individually and as an ordered combination recite an inventive concept through the system’s distributed architecture.
Claim 1 is also like the claims in BAS-COM because even though the system in the ’065 patent relies upon some arguably generic limitations, when all limitations are considered individually and as an ordered combination, they provide an inventive concept through the use of distributed architecture. This is similar to the design in BASCOM which permitted the invention to have a filtering tool with the benefits of a filter on a local computer and the benefits of a filter on an ISP server. The benefits in BASCOM were possible because of customizable filtering features at specific locations remote from the user. Similarly, the benefits of the ’065 patent’s claim 1 are possible because of the distributed, remote enhancement that produced an unconventional result—redueed data flows and the possibility of smaller databases. This arrangement is not so broadly described to cause preemption concerns. Instead, it is narrowly circumscribed to the particular system outlined. As in BASCOM, this is a technical-improvement over prior art technologies and served to improve the performance of the system itself.
For all these reasons, and with the understanding that claim 1 is representative, we reverse the district court’s judgment that claims 1, 4, 7, 13, and 17 of the ’065 patent are ineligible under § 101.
b. ’510 Patent
Amdocs asserted claims 16,17, and 19 of the ’510 patent. Claim 16 is representative:
16. A computer program product stored in a computer readable medium for reporting on a collection of network usage information from a plurality of network devices, comprising:
computer code for collecting network communications usage information in real-time from a plurality of network devices at a plurality of layers;
computer code for filtering and aggregating the network communications usage information;
computer code for completing a plurality of data records from the filtered and aggregated network communications usage information, the plurality of data records corresponding to network usage by a plurality of users;
computer code for storing the plurality of data records in a database;
computer code for submitting queries to the database utilizing predetermined reports for retrieving information on the collection of the network usage information from the network devices; and
computer code for outputting a report based on the queries;
wherein resource consumption queries are submitted to the database utilizing the reports for retrieving information'on resource consumption in a network; and wherein a resource consumption report is outputted based on the resource consumption queries.
’510 patent at 17:3-29.
This claim, is eligible for patenting for reasons similar to those that under-girded the eligibility of the ’065 patent claims. In this instance, the district court *1303 concluded under step one that claim 16 was directed to an abstract idea—“using a database to compile and report on network usage information” without any sufficient ‘inventive concept’ under step. two. Amdocs, 56 F.Supp.3d at 822-23. However, contrary to the district court’s analysis, even if claim 16 were directed to an abstract idea under step one, the claim is eligible under step two.
Claim 16 requires, inter alia, that the network usage information is collected in real-time, from a plurality of network devices at a plurality of layers and is filtered and aggregated before being completed into a plurality of data records. In Amdocs I, we approved of the district court’s construction of “completing” to mean “enhance a record until all required fields have been populated,” in which “enhance” carried the sanie meaning as the same term in the ’065 patent. 761 F.3d at 1340.
The collection, filtering, aggregating, and completing steps all depend upon the invention’s unique distributed architecture—the same architecture outlined in our earlier analysis of the ’065 patent. An understanding of how this is accomplished is only possible through an examination of the claims in light of the written déseription.
The written description explains that the distributed architecture allows the system to efficiently and accurately collect network usage information in a manner designed for efficiency to minimize impact on network and system resources. This enables load distribution, and that is an advantage over the prior art because it makes it easier to keep up with record flows and allows for smaller databases. ’510 patent at 3:60-65 (“The system is based on a modular, distributed, highly scalable architecture capable of running on multiple platforms. Data collection and management is designed for efficiency to minimize impact on the network and system resources. The system minimizes network impact by collecting and processing data close to its source.”), 4:20-21 (“Distributed filtering and aggregation eliminates system capacity bottlenecks.”), 4:35-44 (“Importantly, the distributed data gathering, filtering and enhancement performed in the system 100 enables load distribution. Granular data can reside in the peripheries of the system 100, close to the information sources. This helps avoids [ (sic) ] reduce congestion in network bottlenecks but still allows the data to be accessible from a central location. In previous systems, all the network information flows to one location, making it very difficult to keep up with the massive record flows from the network.devices and requiring huge databases.”), 7:8-25 (describing how the gatherers act as a distributed filtering and aggregation system and how this improves scalability and efficiency of the system by reducing the volume of data sent to the CEM).
With this understanding, it is clear that even if claim 16 were viewed as being directed to an abstract idea under step one—rather than to an improvement in cbmputer functionality—claim 16 satisfies step two. The collection, filtering, aggregating, and completing (including enhancing) steps all depend upon the system’s unconventional distributed architecture. While some individual limitations arguably may be generic, others are unconventional and the ordered combination of these limitations yields an inventive concept sufficient to confer eligibility without undue preemption. The claim recites a technological solution to a technological problem specific to computer networks—an unconventional solution that was an improvement over the prior art. The claim is therefore more similar to the eligible claims in DDR Holdings and BASCOM than the ineligible claims in Digitech, Content Extraction, and In re TLI Commc’ns.
*1304 For those reasons, and with the understanding that claim 16 is representative, we reverse the district court’s judgment that claims 16,17, and 19 of the ’610 patent are ineligible under § 101.
c. ’984 Patent
Amdocs alleged infringement of claims 1, 2, 7, 8, and 13 of the ’984 patent. Claim 1 is representative:
1. A method for reporting on the collection of network usage information from a plurality of network devices, comprising:
(a) collecting network communications usage information in real-time from a plurality of network devices at a plurality of layers utilizing multiple gatherers each including a plurality of information source modules each interfacing with one of the network devices and capable of communicating using a protocol specific to the network device coupled thereto, the network devices selected from the group consisting of routers, switches, firewalls, authentication servers, web hosts, proxy servers, netflow servers, databases, mail servers, RADIUS servers, and domain name servers, the gatherers being positioned on a segment of the network on which the network devices coupled thereto are positioned for minimizing an impact of the gatherers on the network;
(b) filtering and aggregating the network communications usage information;
(c) completing a plurality of data records from the filtered and aggregated network communications usage information, the plurality of data records corresponding to network usage by a plurality of users;
(d) storing the plurality of data records in a database;
(e) allowing the selection of one of a plurality of reports for reporting purposes;
(f) submitting queries to the database utilizing the selected reports for retrieving information on the collection of the network usage information from the network devices; and
(g) outputting a report based on the queries.
’984 patent at 15:31-63.
Claim 1 is eligible for patenting for reasons similar to those already discussed with respect to the ’065 and ’510 patents. The district court concluded that claim 1 was directed to the abstract idea of “reporting on the collection of network usage information from a plurality of network devices” under step one and did not satisfy step two. Amdocs, 56 F.Supp.3d at 824-25. However, even if we were to accept the district court’s conclusion regarding step one, the claim is eligible under step two.
Claim 1 requires the completion of a plurality of data records in a manner that depends upon enhancement—which depends upon the system’s distributed architecture, as explained previously. Similarly, claim 1 requires collecting, filtering, and aggregating information in a manner that also depends upon the system’s distributed architecture. Claim 1 is therefore eligible for the same reasons that supported eligibility with respect to claim 16 of the ’510 patent. The written description in both patents describes the collection, filtering, and aggregation in terms of the invention’s distributed architecture. See, e.g., ’984 patent at 3:28-32, 3:56-57, 4:3-13, 6:45-54. Although some of the components and functions may appear generic, several limitations are individually unconventional (e.g., completing depends upon distributed enhancing) and the overall ordered combination of all of the limitations was unconventional. It produced the advantage over the prior art by solving the technological problem at stake.
*1305 For those reasons, and with the understanding that claim 1 is representative, we reverse the district court’s judgment that claims 1, 2, 7, 8, and 13 of the ’984 patent are ineligible under § 101.
d. ’797 Patent
Amdocs alleged infringement of claims 1, 2, 7, 8, and 19 of the ’797 patent. Claim 1 is representative:
1. A method for generating a single record reflecting multiple services for accounting purposes, comprising:
(a) identifying a plurality of services carried out over a network;
(b) collecting data describing the plurality of services; and
(c) generating a single record including the collected data, wherein the single record represents each of the plurality of services;
wherein the services include at least two services selected from a group consisting of a hypertext transfer protocol (HTTP) session, an electronic mail session, a multimedia streaming session, a voice over Internet Protocol (IP) session, a data communication session, an instant messaging session, a peer-to-peer network application session, a file transfer protocol (FTP) session, and a telnet session;
wherein the data is collected utilizing an enhancement procedure defined utilizing a graphical user interface by: listing a plurality of available functions to be applied in real-time prior to end-user reporting,
allowing a user to choose at least one of a plurality of fields, and
allowing the user to choose at least one of the listed functions to be applied to the chosen field in real-time prior to the end-user reporting,
’797 patent at 16:30-37 and ’797 Certificate of Correction.
Here again claim 1 is eligible for patenting for reasons similar to those discussed with respect to the claims in the ’065, ’510⅜ and ’984 patents. The district court found that claim 1 was directed to the abstract idea of “generating] a single record reflecting multiple services” under step one, without a sufficient ‘inventive concept’ under step two. See Amdocs, 56 F.Supp.3d at 823-24. However, as with the other patents, even if we were to accept the district court’s step one conclusion, the claim is eligible under step two.
As with the other patents, the collecting, generating, and enhancement procedure required by claim 1 all depend upon the system’s distributed architecture. Regarding collection, see, e.g., ’797 patent at 5:39-45 (“The system is based on a modular, distributed, highly scalable architecture capable of running on multiple platforms. Data collection and management is designed for efficiency to minimize impact on the network and system resources. The system minimizes network impact by collecting and processing data close to its source.”).
Regarding generating, we specifically construed the language “single record represents each of the plurality of services” as “one record that includes customer usage data for each of the plurality of services used by the customer on the network” such that the language allowed for the inclusion of a plurality of services by aggregation. Amdocs I, 761 F.3d at 1340-41. Aggregation depends upon the invention’s distributed architecture. See, e.g., ’797 patent at 6:1-2 (“Distributed filtering and aggregation eliminates system capacity bottlenecks.”), 8:64-67 (“The distributed data filtering and aggregation eliminates capacity bottlenecks improving the scalability and efficiency of the system 800 by reducing the volume of data sent on the network to the OEM 870.”), 9:1-4 (“Aggregation *1306 can be done by accumulating groups of data record flows, generating a single data record for each group. That single record then includes the aggregated information. This reduces the flow of the data records.”), 9:36-40 (“The filtering and aggregation reduces the amount of data that is stored in the central database 875 while not jeopardizing the granularity of data that is necessary in order to create creative usage-based products.”).
Finally, enhancement procedures are described in terms of enhancement. See, e,g., id. at 9:41-61 (describing enhancement procedures in the context of enhancements). Enhancement in the ’797 patent, as in every other patent at issue, depends upon the distributed nature of the system. See, e.g., id. at 6:16-26 (“Importantly, the distributed data gathering, filtering and enhancements performed in the system 800 enables load distribution. Granular data can reside in the peripheries of the system 800, close to the information sources. This helps avoids [(sic)] reduce congestion in network bottlenecks but still allows the data to be accessible from a central location. In previous systems, all the network information flows to one location, making it very difficult to keep up with the massive record flows from the network devices and requiring huge databases.”).
Similar to the other examined claims in the patents at issue, representative claim 1 recites a series of limitations that, when considered individually and as an ordered combination, provide an inventive concept sufficient to confer eligibility. While the components and functionality necessarily involved in the ’797 patent (e.g., ISMs, gatherers, network devices, collection, aggregation, and enhancement) may be generic at first blush, an examination of the claim in light of the written description reveals that many of these components and functionalities are in fact neither generic nor conventional individually or in ordered combination. Instead, they describe a specific, unconventional technological solution, narrowly drawn to withstand preemption concerns, to a technological problem.
For those reasons, and with the understanding that claim-1 is representative, we reveráe the district court’s judgment that claims 1, 2, 7, 8, and 19 of the ’797 patent are ineligible under § 101.
Summary
The dissent criticizes the majority for “avoiding] determining whether the asserted claims are directed to an abstract idea, or even identifying what the underlying abstract idea is.” Dissent at 1307. In fact, with regard to each of the challenged patents we identified the abstract idea that the district court found to be disqualifying. For argument’s sake we accepted the district court’s view of the disqualifying abstract ideas, and in each instance we then explained why, in our view, the claims seen in their entirety are not disqualified. The Alice/Mayo framework does not require more.
The dissent concedes that the written description discloses a network monitoring system “eligible for patenting. The specifications disclose a distributed system architecture comprising special-purpose components configured to cooperate with one another according to defined protocols.... The disclosed system is pa!tent eligible.” Dissent at 1312, We agree. Unlike the dissent, however, we find the claims at issue, understood in light of that written description, to be eligible for patenting. To be clear: ruling these claims to be patent-eligible does not mean that they are valid; they have yet to be tested under the statutory conditions for patentability, e.g., §§ 102 (novelty) and 103 (non-obvious subject matter), and the requirements of § 112 (written description and enable *1307 ment), issues raised in Openet’s defensive pleadings.
Conclusion
Accordingly, we reverse the district court’s judgment that the claims at issue in the ’065, ’510, ’984, and ’797 patents are invalid under § 101 of the Patent Act.
We remand for the trial court to undertake further proceedings as called for by the issues as yet unaddressed, and such other proceedings as the court may deem appropriate.
REVERSED AND REMANDED
No costs.

. For examples, compare In re Bilski, 545 F.3d 943, 955-56 (Fed. Cir. 2008) (en banc), reaffirming 'machine-or-transformation' as the % 101 test for process claims, with Bilski v. Kappos, 561 U.S. 593, 604, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010), indicating that 'machine-or-transformation' is perhaps one possible test, but not the only one. See also the several opinions in this court’s CLS Bank International v. Alice Corp., 717 F.3d 1269 (Fed. Cir. 2013) (en banc).

. See also Robert W. Bahr, Deputy Comm'r for Patent Examination Policy, USPTO, Recent Subject Matter Eligibility Decisions (Enfish, LLC v. Microsoft Corp. and TLI Commc’ns LLC v. A.V. Automotive, LLC) (2016) at 2: "In summary, when performing an analysis of whether a claim is directed to an abstract idea (Step 2A), examiners are to continue to determine if the claim recites (i.e., sets forth or describes) a concept that is similar to concepts previously found abstract by the courts,"

. See Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, 67 S.Ct. 6, 91 L.Ed. 3 (1946).

. We state our concern lest the dissent’s generalizations of law may mislead the reader. In the complexities of § 101, the law is evolving into greater certitude based on experience, not on generalizations. Words out of context are less useful—especially if inapt. For example, the Court's rejection of Samuel Morse’s notorious claim 8, regarding the use of electromagnetism, was for overbroad preemption of a natural law, not because it was an "abstract idea,” See, e.g., Mayo, 132 S.Ct. at 1294 (citing O'Reilly v. Morse, 56 U.S. 62, 112-20, 14 L.Ed. 601 (1854)).

. Though the Supreme Court does not uniformly adhere to the practice, this court often has used the term "limitation” to refer to requirements stated in a patent claim, and the term "element” to refer to the parts of an entity accused of infringing. We will follow that practice here.

. For additional examples of ineligible claims post-Alice, see, e.g., FairWarning IP, LLC v. Iatric Systems, Inc., 839 F.3d 1089 (Fed. Cir. 2016); Intellectual Ventures I LLC v. Symantec Corp., 838 F.3d 1307 (Fed. Cir.2016); Affinity Labs of Texas, LLC v. DirecTV, LLC, 838 F.3d 1253 (Fed. Cir.2016); Affinity Labs of Texas, LLC v. Amazon.com Inc., 838 F.3d 1266 (Fed. Cir.2016); Electric Power Group, 830 F.3d 1350.

. For additional examples of eligible claims post-AKce, see McRO, Inc. v. Bandai Namco Games America Inc., 837 F.3d 1299 (Fed. Cir.2016); Enfish, 822 F.3d 1327.